1
2
3
4
5
6
7

8                   UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10

11  OLEG POGREBNOY,                     CV 10-8532 PA (SSx)

12            Plaintiff,                FINDINGS OF FACT AND
                                        CONCLUSIONS OF LAW
13       v.

14  RUSSIAN NEWSPAPER
    DISTRIBUTION, INC., et al.,
15
            Defendants.
16

17

18

19       This action involves allegations of trademark and trade dress infringement asserted

20  by plaintiff Oleg Pogrebnoy ("Pogrebnoy") against defendants Russian Newspaper

21  Distribution, Inc., MMAP, Inc., Vitaly Matusov ("Matusov"), and Alexander Ginzburg

22  ("Ginzburg") (collectively "Defendants") arising out of the publication of a Russian

23  language newspaper titled "КУРЬЕР" in Cyrillic and translated by Pogrebnoy as "courier"

24  in English.

25       Pogrebnoy, appearing pro se, commenced this action on November 9, 2010.  In his

26  First Amended Complaint ("FAC"), Pogrebnoy alleged claims for:  (1) trademark

27  infringement under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) against

28  Defendants; (2) trade dress infringement under section 43(a) of the Lanham Act, 15 U.S.C. §

1125(a) against Defendants; (3) cancellation of a federal trademark registration for "LAKurier.com" pursuant to 15 U.S.C. § 1064 against defendants Russian Newspaper Distribution, Inc. and Ginzburg; and (4) unfair competition against Defendants.

The parties filed cross-motions for summary judgment. In a June 28, 2011 Minute Order, the Court concluded that Pogrebnoy had not provided admissible evidence of the transfer of his asserted intellectual property rights from one of the entities in the purported chain of title to another of the predecessor entities. As a result, the Court concluded that Pogrebnoy lacked standing to pursue his claims and entered Judgment in favor of Defendants. On November 14, 2013, the Ninth Circuit issued a Mandate reversing the entry of Judgment and, among other things, directed the Court "to address alternate theories of standing, including whether Pogrebnoy acquired an ownership interest in the Kurier mark on the basis of an assignment from his wholly-owned company, which had priority of use of the mark over defendants, or whether Pogrebnoy was a nonowner with a cognizable commercial interest in the Kurier mark." Pogrebnoy v. Russian Newspaper Distrib., Inc., 536 F. App'x. 737, 738 (9th Cir. Aug. 5, 2013) (citing Halicki Films, LLC v. Sanderson Sales & Mktg., 547 F.3d 1213, 1225-26 (9th Cir. 2008)).

The Court, sitting without a jury, conducted a bench trial on February 25, 2014, September 2, 2014, and September 3, 2014. The parties submitted trial declarations, the Court took evidence, and allowed for cross-examination of the parties' witnesses. Following the trial, the parties submitted proposed Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).[1] Defendants also filed a Motion for Judgment on Partial Findings Pursuant to Federal Rule of Civil Procedure 52(c) (Docket No. 179).

Having considered the materials submitted by the parties, observed the witnesses during cross-examination, and after reviewing the evidence, the Court makes the following

---

[1]    The Court ordered the parties to review the other side's proposed Findings of Fact and Conclusions of Law and to mark them to indicate the particular factual assertions and legal conclusions they disputed. The facts that are in dispute on which the Court relies in reaching its conclusion are supported by the record.

Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a). Any finding of fact that constitutes a conclusion of law is hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is hereby adopted as a finding of fact.  Defendants' Motion for Judgment on Partial Findings is denied as moot.

## I.    FINDINGS OF FACT

1.    Pogrebnoy's FAC alleges that his trademark, which is unregistered, "consists of the Russian word 'KYPbEP.'"  (FAC ¶ 1.)

2.    "KYPbEP" is the Russian equivalent of the English word "courier."

3.    Pogrebnoy asserts that he has standing to pursue the claims alleged in the FAC as a result of an assignment from Radony, Inc., a company he controls, that he executed in November 2010.

4.    According to Pogrebnoy, Radony, Inc. acquired the intellectual property rights that were assigned to him in November 2010, through a series of assignments between companies either directly or beneficially owned and controlled by him.

5.    Pogrebnoy testified that he was the first owner of the intellectual property in 1992 until he transferred his rights to Russian Kurier, Inc., which owned the rights from November 1992 until 1996.  Russian Kurier, Inc. transferred the rights in 1996 to Kurier Weekly, Inc.  Kurier Weekly, Inc. was apparently owned by Svetlana Yavorsky, although Pogrebnoy claims that he was the "beneficial owner" and Yavorsky was merely the "nominal" owner.  According to Pogrebnoy, in 2000, Kurier Weekly, Inc. transferred its rights to VPP, Inc., which owned the rights until 2005 or 2006, when the rights were assumed by RWNY, Inc.  RWNY, Inc. then transferred the rights to Radony, Inc. in 2007. Radony, Inc. owned the rights until November 2010, when Pogrebnoy caused Radony, Inc. to transfer the rights to him so that he could pursue this action pro se.  Other than the assignment from Radony, Inc. to Pogrebnoy, Pogrebnoy has not admitted into evidence any written document memorializing these transfers.  Nor is there any evidence, other than Pogrebnoy's testimony, that these transfers explicitly or implicitly transferred any trademark or trade dress rights.

6.    At the time the Court ruled on the parties' cross-motions for summary judgment, Pogrebnoy had stated that the transfer from Kurier Weekly, Inc. to VPP, Inc. was memorialized in a written assignment that was stored at his parents' house located in Ukraine.  Although Pogrebnoy's Trial Declaration stated that he "recently traveled to Kiev and conducted due diligent search in his parents' house and was able to locate said agreement," Pogrebnoy clarified at the February 7, 2014 pretrial conference that his trial declaration was incorrect and that he could not find the assignment from Kurier Weekly, Inc. to VPP, Inc.  (Trial Declaration of Oleg Pogrebnoy ("Pogrebnoy Decl.") ¶ 33 (Docket No. 131); February 7, 2014 transcript, 22:20-23:14.)

7.    At trial, Pogrebnoy stated that these transfers between companies were undertaken for a variety of purposes, including to avoid judgments, bad publicity from litigation unrelated to the present dispute, and unpaid taxes.  No consideration was ever provided for these assignments.

8.    According to Pogrebnoy, he began publishing and distributing a Russian language newspaper titled "KYPbEP" in New York in 1992.

9.    Pogrebnoy and Matusov agree that their business relationship started in 1994 with Pogrebnoy sending to Matusov copies of the New York version of the KYPbEP newspaper.  According to Matusov, he distributed the KYPbEP newspaper in Los Angeles for a period of approximately 12 weeks to test the desirability of launching a Los Angeles version of KYPbEP.  Pogrebnoy did not charge Matusov for these copies, and there is no evidence that Pogrebnoy sold advertisements directed at the Los Angeles market during this test period or in any other way received any funds as a result of this test of the Los Angeles market.

10.    Pogrebnoy and Matusov agree that they entered into an oral contract in 1994.  They dispute the terms of that contract.

11.    According to Pogrebnoy, he and his New York companies would provide the film negatives, and after the technology changed, computer files, of the New York KYPBeP to Matusov for creation of the Los Angeles KYPBeP.  In exchange, Matusov was to pay

-4-

1   Pogrebnoy and his companies 50% of his profits.  Pogrebnoy testified that this arrangement

2   was modified in about 1996 with Matusov retaining 60% of the profits and Pogrebnoy

3   receiving 40% of the profits of the Los Angeles KYPBeP.

4         12.     According to Matusov, he promised to pay Pogrebnoy a flat fee of $2,800.00

5   each month for the negatives, and later computer files, of the New York KYPBeP from

6   which he would then create the Los Angeles KYPBeP.  Matusov states that he would replace

7   most of the advertisements appearing in the New York KYPBeP with advertisements he sold

8   for the Los Angeles KYPBeP and use some but not all of the articles that had appeared in

9   the New York KYPBeP.  Matusov would not replace advertisements that Pogrebnoy and his

10  companies had sold to run in both the New York and Los Angeles versions of KYPBeP.

11  These advertisements would run in the Los Angeles version of KYPBeP at no charge to

12  Pogrebnoy.

13        13.     Matusov would then arrange for the publication and distribution of the Los

14  Angeles version of KYPBeP.  Defendant Ginzberg became involved in the production of the

15  Los Angeles version of KYPBeP in 1995.

16        14.     In 1996, Pogrebnoy added "'Kurier' Russian Weekly Newspaper" to the

17  masthead of the New York KYPBeP.  This description, which Pogrebnoy calls an

18  "anglicized" translation of the word "courier" with a Cyrillic "K," was also used in the Los

19  Angeles version of KYPBeP.  Although the FAC does not clearly articulate the claim,

20  Pogrebnoy asserts that he owns the rights to the unregistered trademarks of both "KYPBeP"

21  and "Kurier."[2/]

22

23

_____

24  [2/]     In his papers throughout this litigation, Pogrebnoy has referred to both marks

25  collectively as the "Kurier" mark.  Without appreciating the potential distinctions between
    "KYPBeP" and "Kurier," this Court similarly used "Kurier" when discussing the trademarks

26  at issue in some of its prior orders.  The Ninth Circuit's Opinion on appeal similarly used
    "Kurier" and "KYPBeP" interchangeably.  As will be discussed in further detail below, the

27  Court concludes that the alleged marks should be evaluated separately.  The Court will
    therefore distinguish between the two alleged marks in these Findings of Fact and

28  Conclusions of Law.

15.     Whatever the arrangement between Pogrebnoy and Matusov was, it continued until 2007, when Pogrebnoy accused Matusov of not paying to Pogrebnoy all sums Pogrebnoy thought were owed to him.

16.     According to Matusov, Pogrebnoy was at that time complaining that his New York KYPBeP was having financial problems.  Matusov states that Pogrebnoy told him that "he would leave me in peace if I immediately turned over to him my business, including all my phone numbers, all my accounts, the keys to my post office box, and all checks" made payable to Matusov's company.  According to Matusov, Pogrebnoy said that if Matusov did not agree to these terms and surrender his business to Pogrebnoy, Pogrebnoy would "go to 'war' with me."

17.     Pogrebnoy states that as a result of this dispute, he terminated Matusov's license to use his trademarks and trade dress on November 26, 2007.

18.     Pogrebnoy instituted a trademark, trade dress, and breach of contract action against Defendants in February 2008 in Case No. CV 08-1080 PA (SSx) (the "2008 Action").  In support of his Motion for Partial Summary Judgment in the 2008 Action, Pogrebnoy stated that, contrary to the allegations in the operative Complaint filed in that action, which had alleged that Pogrebnoy was the owner of the trademarks, those marks were owned by Radony, Inc.  The Court therefore concluded that Pogrebnoy was not the owner of the intellectual property at issue and that Defendants' were entitled to summary judgment.

19.     Ginzburg and Russian Newspaper Distribution, Inc. ("RND"), obtained a federal registration for the trademark "LAKurier.com" in August 2010.

20.     Pogrebnoy caused Radony, Inc. to assign its intellectual property rights to him and commenced this action in November 2010.  The New York KYPBeP ceased publication in 2011.

21.     Pogrebnoy's evidence in support of his claim for damages of $1,707,450.23 is contained in his Additional Trial Declaration of Oleg Pogrebnoy ("Add'l Pogrebnoy Decl.") (Docket No. 146).  Pogrebnoy has calculated this amount based on his own "calculations of

1  the Defendants' bank statements" to derive Defendants' gross income and subtracting from

2  that amount his estimates of their printing and distribution costs.  (Add'l Pogrebnoy Decl. ¶¶

3  76-81.)

4       22.    The Court, having observed Pogrebnoy during his testimony, finds that

5  Pogrebnoy is not a credible witness.  He was evasive and combative while testifying.  He

6  also asserted his Fifth Amendment rights against self-incrimination when he initially

7  declined to answer several questions.  See Nationwide Life Ins. Co. v. Richards, 541 F.3d

8  903, 911 (9th Cir. 2008) ("When a party asserts the privilege against self-incrimination in a

9  civil case, the district court has discretion to draw an adverse inference from such

10  assertion.").  The Court also finds that Pogrebnoy frequently failed to observe corporate

11  formalities, and has not always conducted his business dealings in an entirely ethical

12  manner.

13       23.    The Court also concludes, based on its observations of Matusov's testimony,

14  that Matusov is not an entirely credible witness and that he too has not always conducted his

15  business dealings in an entirely ethical manner.

16  **II.**     **CONCLUSIONS OF LAW**

17       1.    "To establish standing to sue for trademark infringement under the Lanham

18  Act, a plaintiff must show that he or she is either (1) the owner of a federal mark

19  registration, (2) the owner of an unregistered mark, or (3) a nonowner with a cognizable

20  interest in the allegedly infringed trademark."  Halicki Films, LLC v. Sanderson Sales &

21  Mktg., 547 F.3d 1213, 1225 (9th Cir. 2008); see also id. at 1226 (quoting Nat'l Licensing

22  Ass'n, LLC v. Inland Joseph Fruit Co., 361 F. Supp. 2d 1244, 1256 (E.D. Wash. 2004)

23  ("[T]o maintain a [claim under § 1125(a)], the plaintiff must show that it has a commercial

24  interest in the allegedly misused mark that is likely to be damaged.") (citation omitted)).

25       2.    The Court concludes that Pogrebnoy has established by a preponderance of the

26  evidence that he is either an owner of the purported unregistered marks and trade dress at

27  issue in this litigation or a nonowner with a cognizable interest in the allegedly infringed

28

intellectual property to establish his standing to pursue his claims that Defendants have infringed his intellectual property rights.

3. Marks are generally classified in one of five categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful. Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768, 112 S. Ct. 2753, 120 L. Ed. 2d 615 (1992). Which category a mark belongs in is a question of fact. See Lahoti v. VeriCheck, Inc., 586 F.3d 1190, 1195–96 (9th Cir.2009). Suggestive, arbitrary, and fanciful marks are considered "inherently distinctive" and are automatically entitled to federal trademark protection because "their intrinsic nature serves to identify a particular source of a product." Two Pesos, 505 U.S. at 768, 112 S. Ct. 2753. Generic marks are not eligible for trademark protection. Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1141 (9th Cir. 2002). Merely descriptive marks are somewhere in-between; although they are not inherently distinctive and are therefore not entitled to automatic trademark protection, a merely descriptive mark can become protectable if it has acquired distinctiveness "as used on or in connection with the applicant's goods in commerce." Zobmonda Entm't, LLC v. Falls Media, LLC, 602 F.3d 1108, 1113 (9th Cir. 2010) (quoting 15 U.S.C. § 1052(f)). This acquired distinctiveness is referred to as "secondary meaning." Two Pesos, 505 U.S. at 769, 112 S. Ct. 2753.

4. The Court concludes that KYPBeP is a distinctive mark. See Gazette Newspapers, Inc. v. New Paper, Inc., 934 F. Supp. 688, 693 (D. Md. 1996) ("The policies underlying the classifications . . . indicate that 'Gazette' should be considered descriptive.").

5. "Under the principle of first in time equals first in right, priority ordinarily comes with earlier use of a mark in commerce." Grupo Gigante SA De CV v. Dallo & Co., 391 F.3d 1088, 1093 (9th Cir. 2004). "[S]econdary meaning defines the geographic area in which a user has priority, regardless of who uses the mark first. Under what has become known as the Tea Rose–Rectanus doctrine, priority of use in one geographic area within the United States does not necessarily suffice to establish priority in another area. Thus, the first

-8-

1  user of a mark will not necessarily be able to stop a subsequent user, where the subsequent

2  user is in an area of the country 'remote' from the first user's area."  Id. at 1096.

3      6.    Here, Pogrebnoy did not establish by a preponderance of the evidence that he

4  was the first in time to use the KYPBeP mark in the relevant Los Angeles-area market.  His

5  shipment of newspapers to Matusov for purposes of Matusov's test of the Los Angeles

6  market free of charge is insufficient to establish that Pogrebnoy used the KYPBeP mark in

7  commerce in the relevant market prior to Matusov's first use of the mark.  See Dept. Of

8  Parks & Recreation v. Bazaar del Mundo Inc., 448 F.3d 1118, 1125-26 (9th Cir. 2006) ("To

9  demonstrate priority of use, the State must prove (1) that it actually adopted and used the

10  marks in commerce prior to Bazaar del Mundo's registration in such a manner that

11  sufficiently associated the marks with the State's provision of tourism and recreational

12  services; and (2) that its use of the marks was continuous and not interrupted."); see also id.

13  at 1126 ("While the first use need not be extensive, the use must be bona fide and

14  commercial in character.").

15      7.    Pogrebnoy has also failed to establish that, even if Matusov's distribution of

16  KYPBeP in Los Angeles during the limited test period should be considered Pogrebnoy's

17  use in commerce of the descriptive mark in the relevant geographic area, the KYPBeP mark

18  had acquired secondary meaning during this limited distribution.  Id. at 1128 ("Even were

19  the State able to establish prior commercial use, because the trademarks are descriptive, i.e.,

20  based on their geographic and historical origin, the State would not be entitled to trademark

21  protection unless it were able to establish that the marks 'acquired secondary meaning., i.e.,

22  it 'has become distinctive of the applicant's goods in commerce.'") (citation omitted).

23  Pogrebnoy has not presented sufficient evidence to establish that the KYPBeP mark

24  obtained secondary meaning in the relevant geographic area during the test period in 1994.

25  As such, he is unable to establish that he is the senior user of the KYPBeP mark in Los

26  Angeles.

27      8.    Pogrebnoy's claim that Defendants have infringed his "Kurier" mark are even

28  weaker.  "[I]t is of course well settled that the foreign equivalent of the English common

-9-

1   descriptive name for an article is no more registrable that the English name itself, despite the

2   fact that the foreign word may be meaningless to the public generally.  Finally, it should be

3   noted that a notation which constitutes a play upon or a misspelling of a generic term may

4   nevertheless be registered as a trademark if the notation differs from the generic term

5   sufficiently so that the purchasing public can readily distinguish between the two, and there

6   is no danger that the notation will be mistaken for the generic term."  In re Coney Island

7   Bredzel Co., 199 U.S.P.Q. 45 (T.T.A.B. 1978) (citations omitted).  Even if Kurier, like

8   KYPBeP, is a descriptive mark, Pogrebnoy's evidence establishes that it was first introduced

9   into the Los Angeles market in 1996.  By that time, Matusov was printing and distributing

10  the Los Angeles KYPBeP.  There is therefore no evidence that Pogrebnoy was the first to

11  use the mark in commerce in Los Angeles.  Nor has Pogrebnoy established by a

12  preponderance of the evidence that Kurier, even assuming it is a descriptive mark, has ever

13  acquired secondary meaning in Los Angeles.  See Zobmondo Entm't, 602 F.3d at 1113

14  ("The plaintiff bears the ultimate burden of proof in a trademark-infringement action that the

15  trademark is valid and protectable.").

16        9.      Pogrebnoy has also failed to satisfy his evidentiary burden to establish his

17  claim for trade dress infringement.  "To sustain a claim for trade dress infringement, [a

18  plaintiff] must prove:  (1) that its claimed dress is nonfunctional; (2) that its claimed dress

19  serves a source-identifying role either because it is inherently distinctive or has acquired

20  secondary meaning; and (3) that the defendant's product or service creates a likelihood of

21  consumer confusion."  Clicks Billiards, Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1258 (9th

22  Cir. 2001).  Pogrebnoy's trial testimony does not adequately identify the purported

23  unregistered trade dress.  "[A] plaintiff seeking to protect its trade dress . . . must articulate

24  the design elements that compose the trade dress."  Yurman Design, Inc. v. PAJ, Inc., 262

25  F.3d 101, 116 (2d Cir. 2001).  Nor has Pogrebnoy submitted sufficient evidence to sustain

26  his evidentiary burden that the purported trade dress, whatever it might be, is nonfunctional,

27  is inherently distinctive, or has acquired secondary meaning.

28

10.     In asserting that he "terminated" Matusov's "license to use the Kurier newspaper, trademark and trade dress" on November 26, 2007, Pogrebnoy claims that he had licensed to Matusov the KYPBeP and Kurier trademarks.  If Pogrebnoy and Matusov had agreed that Matusov would license the trademarks, and this agreement allowed Pogrebnoy to terminate that license, Defendants' use of those marks after termination would be infringing.  See Wetzel's Pretzels, LLC v. Johnson, 797 F. Supp. 2d 1020, 1025 (C.D. Cal. 2011); McCarthy on Trademarks § 25:31 ("Once a . . . license contract is terminated, there is no doubt that the former . . . licensee has no authorization or consent to continue use of the mark.  After the permission to use the mark has ended, use of the mark must cease.").  Additionally, if Defendants' use of the marks and trade dress was pursuant to a license from Pogrebnoy, their use would inure to the benefit of Pogrebnoy, which would make Pogrebnoy the senior user in the Los Angeles market and establish Defendants' infringement.  See McCarthy on Trademarks § 18:52; see also Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 979 (9th Cir. 2006); Watec Co. v. Liu, 403 F.3d 645, 651-52 (9th Cir. 2005).

11.     The Court concludes that Pogrebnoy has failed to establish by a preponderance of the evidence that he either expressly or implicitly granted to Defendants a license to use the trademarks and trade dress at issue in this litigation.  Specifically, Pogrebnoy's description of the oral contract between him and Matusov did not include any terms concerning a trademark and trade dress license.  Nor has Pogrebnoy introduced sufficient evidence for this Court to conclude that it is more likely than not that the relationship between him and Matusov created an implied trademark and trade dress license.  See Dept. of Parks & Recreation, 448 F.3d at 1130 ("The State cannot demonstrate an implied licensing agreement because it failed to introduce any evidence of an agreement or course of conduct by the parties to contract for a trademark license.").  There simply is no evidence, let alone a preponderance of evidence, tending to indicate that Pogrebnoy and Matusov discussed any issues concerning trademark and trade dress rights or licenses when they negotiated their oral contract.  Instead, as Matusov testified, it is more likely that the parties agreed that Pogrebnoy would provide the negatives from which Matusov would create the

Los Angeles version of KYPBeP, utilizing the articles and page layouts supplied by Pogrebnoy, in exchange for payment from Matusov.  Pogrebnoy has not satisfied his evidentiary burden to establish that in 1994 when he entered into the oral contract with Matusov that he knew or cared about trademark and trade dress rights.  Nor is there any evidence that Pogrebnoy ever negotiated with Matusov concerning a license for the Kurier mark when that mark was added to the newspapers in 1996.

12.     The Court further determines that there is insufficient evidence to support a conclusion that a trademark and trade dress license should be implied from the parties' relationship and their course of conduct.  The parties did not share accounting information, and Pogrebnoy and his companies were never liable for any of the printing, distribution, or other expenses incurred by the Los Angeles KYPBeP.  Nor did Pogrebnoy and his companies ever review the Los Angeles KYPBeP before it was published.  There is also no evidence to support a conclusion that Matusov would devote more than a decade to developing the Los Angeles KYPBeP if, after building the value of the newspaper, Pogrebnoy could unilaterally terminate the purported license and force Matusov out of the business.  Instead, the evidence adduced at trial supports the conclusion that, at most, Pogrebnoy could terminate his obligation to supply the articles and page layouts that had been prepared by the New York KYPBeP.

13.     This conclusion is further supported by the fact that after Pogrebnoy and Matusov entered into their oral contract, Pogrebnoy has been involved in several intellectual property disputes involving both copyright law, see Itar-Tass Russian News Agency v. Russian Kurier, Inc., 886 F. Supp. 1120 (S.D.N.Y. 1995), and trademark licensing, see Russian Kurier, Inc. v. Russian American Kurier, Inc., 899 F. Supp. 1204 (S.D.N.Y. 1995). The Court concludes that it is more likely than not that Pogrebnoy learned about the value of intellectual property rights and trademark licenses from those experiences.  As a result, his "termination" of the purported license, some 13 years after entering the oral contract, is not sufficient evidence from which the Court can find the existence of an implied or express license.  Instead, Pogrebnoy appears to be attempting to use the ambiguity in the original

oral contract to take Defendants' business from them.  Pogrebnoy has failed to present sufficient evidence to establish that he is entitled to do so.

14.     Because Pogrebnoy's trademark and trade dress infringement claims fail, his unfair competition claim, based on the same facts, also fails.  See Cleary v. News Corp., 30 F.3d 1255, 1263 (9th Cir. 1994) ("This Circuit has consistently held that state common law claims of unfair competition . . . are 'substantially congruent' to claims made under the Lanham Act."); E & J Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1288 n.2 (9th Cir. 1992) ("[T]he elements of infringement and unfair competition claims are essentially the same; the rulings stand or fall together.").

15.     The Court lacks jurisdiction to consider his claim for cancellation of Defendants' registration of their LAKurier.com mark.  Specifically, 15 U.S.C. § 1119 provides:  "In any action involving a registered mark the court may determine the right to registration, order the cancelation [sic] of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action." According to the Ninth Circuit:  "This language specifies that cancellation may only be sought if there is already an ongoing action that involves a registered mark; it does not indicate that a cancellation claim is available as an independent cause of action." Airs Aromatics, LLC v. Opinion Victoria's Secret Stores Brand Mgmt., 744 F.3d 595, 599 (9th Cir. 2014).  Because Pogrebnoy's KYPBeP and Kurier marks are not registered, this action does not otherwise involve a registered mark.  The Court therefore lacks jurisdiction over his cancellation claim.  "This interpretation also helps preserve the use of actions before the USPTO Trademark Board as the primary vehicle for cancellation." Id. Pogrebnoy's citations to 15 U.S.C. § 1052(d) and 15 U.S.C. § 1064 do not alter this analysis. Instead, those provisions only apply to cancellation proceedings before the Patent and Trademark Office.  See Windsurfing Int'l Inc. v. AMF Inc., 828 F.2d 755, 758 (Fed. Cir. 1987) (holding that 15 U.S.C. § 1064(c) does not authorize suits for cancellation in district courts)' McCarthy on Trademarks § 30:110 ("Lanham Act § 14, 15 U.S.C. § 1064, relates

-13-

only to administrative Trademark Board proceedings in the Patent and Trademark Office.  It does not authorize suits for cancellation in a federal District Court.").

16.     Even if the Court possessed jurisdiction over Pogrebnoy's cancellation claim, he would not be entitled to cancellation of Defendants' LAKurier.com mark.  As the Court has determined in rejecting his infringement claims, that mark does not infringe Pogrebnoy's asserted Kurier mark because he is not the senior user of that mark in the relevant geographic area and he has not otherwise satisfied his evidentiary burden to establish by a preponderance of the evidence that the LAKurier.com mark creates a substantial likelihood of confusion with his Kurier mark or any other grounds for cancellation under 15 U.S.C. § 1052.

17.     Because Pogrebnoy has failed to establish by a preponderance of the evidence his infringement and unfair competition claims, he is not entitled to the damages and injunctive relief he seeks.

18.     Even if Pogrebnoy had established that Defendants were liable for infringement or unfair competition, he has failed to establish by a preponderance of the evidence either the fact of damages or the amount of damages.  See Skydive Arizona, Inc. v. Quattrocchi, 673 F.3d 1105, 1112 (9th Cir. 2012) ("The trier of fact must distinguish between the proof of the fact of damages and the amount of damages because a mark holder is held to a lower standard in proving the exact amount of actual damages.") (citing La Quinta Corp. v. Heartland Properties, LLC, 603 F.3d 327, 342 (6th Cir. 2010)).

19.     "Under the Lanham Act, the court, 'in its discretion,' may award '(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action' for a 'violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 43(a) or (d) . . . , or a willful violation under section 43(c).'"  Skydive Arizona, 673 F.3d at 1111-12 (quoting 15 U.S.C. § 1117(a)); see also Lindy Pen Co. v. Bic Pen Corp., 982 F.2d 1400, 1407 (9th Cir. 1993) (holding that Lanham Act damages for infringement are "subject to equitable principles.").  The Lanham Act provides:

-14-

1  When a violation of any right of the registrant of a mark
2  registered in the Patent and Trademark Office, a violation under
3  section 1125(a) or (d) of this title, or a willful violation under
4  section 1125(c) of this title, shall have been established in any
5  civil action arising under this chapter, the plaintiff shall be
6  entitled, subject to the provisions of sections 1111 and 1114 of
7  this title, and subject to the principles of equity, to recover (1)
8  defendant's profits, (2) any damages sustained by the plaintiff,
9  and (3) the costs of the action.  The court shall assess such
10  profits and damages or cause the same to be assessed under its
11  direction.  In assessing profits the plaintiff shall be required to
12  prove defendant's sales only; defendant must prove all elements
13  of cost or deduction claimed.  In assessing damages the court
14  may enter judgment, according to the circumstances of the case,
15  for any sum above the amount found as actual damages, not
16  exceeding three times such amount.  If the court shall find that
17  the amount of the recovery based on profits is either inadequate
18  or excessive the court may in its discretion enter judgment for
19  such sum as the court shall find to be just, according to the
20  circumstances of the case.  Such sum in either of the above
21  circumstances shall constitute compensation and not a penalty.
22  The court in exceptional cases may award reasonable attorney
23  fees to the prevailing party.

24  15 U.S.C. § 1117(a).

25      20.    Pogrebnoy has not satisfied his evidentiary burden to establish that he has
26  suffered any actual damages.  There is insufficient evidence to establish that the New York
27  version of KYPBeP and Pogrebnoy lost any sales or suffered damages as a result of the
28  publication of the Los Angeles version of KYPBeP.  Nor has Pogrebnoy introduced

sufficient evidence of Defendants' sales to support an award of Defendants' profits were an award of such damages appropriate. Here, an award of any damages, including Defendants' profits, would not be equitable. There is no evidence that any consumers purchased the Los Angeles KYPBeP thinking it was the New York KYPBeP, nor is there any evidence that advertisers were deceived into purchasing advertisements in the Los Angeles KYPBeP thinking they were advertising in the New York KYPBeP.

21.     Moreover, even if Defendants' conduct were infringing, Pogrebnoy has not met his burden to establish that Defendants' infringement was willful. "Willful infringement carries a connotation of deliberate intent to deceive. Courts generally apply forceful labels such as 'deliberate,' 'false,' 'misleading,' or 'fraudulent' to conduct that meets this standard." Lindy Pen Co., 982 F.2d at 1406. Here, for instance, even if the facts established that Pogrebnoy had conveyed to Matusov an actual or implied license to use the trade dress and KYPBeP and Kurier marks that Pogrebnoy could terminate at will, Matusov and Defendants had a genuine basis for disputing those facts such that their continued use of the marks should not be considered willful.

22.     For all of these reasons, the Court, in its discretion, would award $0.00 in damages even if Pogrebnoy were otherwise entitled to a damages award.

23.     Pogrebnoy has failed to establish any claim against defendant MMAP, Inc., which is a defunct corporation.

24.     The Court concludes that this is not an "exceptional case" and therefore declines to award attorneys' fees to the prevailing parties. According to the Ninth Circuit, "exceptional cases" can include those where "the non-prevailing party's case is 'groundless, unreasonable, vexatious, or pursued in bad faith.'" Gracie v. Gracie, 217 F.3d 1060, 1071 (9th Cir. 2000) (quoting Interstellar Starship Servs., Ltd. v. Epix, Inc., 184 F.3d 1107, 1112 (9th Cir. 1999)); see also Interstellar Starship Servs., 184 F.3d at 1112 (explaining that "exceptional cases" may include those in which the losing party engaged in "malicious, bad faith, fraudulent, deliberate or willful conduct"). Although the Court has concluded that

1  Pogrebnoy has not satisfied his evidentiary burden to prove any of his claims, those claims

2  were not groundless, unreasonable, or pursued vexatiously or in bad faith.

3  **Conclusion**

4      For all of the foregoing reasons, defendants Russian Newspaper Distribution, Inc.,

5  MMAP, Inc., Vitaly Matusov, and Alexander Ginzburg are entitled to judgment on all of

6  plaintiff Oleg Pogrebnoy's claims.  Accordingly, the Court will enter judgment in favor of

7  Defendants.

8      IT IS SO ORDERED.

9

10  DATED: December 18, 2014                                    _____

11                                          Percy Anderson
                           UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28