UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| OLEG POGREBNOY, | CV 10-8532 PA (SSx) |
| Plaintiff, | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| v. | |
| RUSSIAN NEWSPAPER DISTRIBUTION, INC., et al., | |
| Defendants. | |

This action involves allegations of trademark and trade dress infringement asserted by plaintiff Oleg Pogrebnoy ("Pogrebnoy") against defendants Russian Newspaper Distribution, Inc., MMAP, Inc., Vitaly Matusov ("Matusov"), and Alexander Ginzburg ("Ginzburg") (collectively "Defendants") arising out of the publication of a Russian language newspaper titled "Курьер" in Cyrillic and translated by Pogrebnoy as "courier" in English.

Pogrebnoy, appearing pro se, commenced this action on November 9, 2010. In his First Amended Complaint ("FAC"), Pogrebnoy alleged claims for: (1) trademark infringement under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) against Defendants; (2) trade dress infringement under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) against Defendants; (3) cancellation of a federal trademark registration for

1  "LAKurier.com" pursuant to 15 U.S.C. § 1064 against defendants Russian Newspaper
2  Distribution, Inc. and Ginzburg; and (4) unfair competition against Defendants.
3        The parties filed cross-motions for summary judgment.  In a June 28, 2011 Minute
4  Order, the Court concluded that Pogrebnoy had not provided admissible evidence of the
5  transfer of his asserted intellectual property rights from one of the entities in the purported
6  chain of title to another of the predecessor entities.  As a result, the Court concluded that
7  Pogrebnoy lacked standing to pursue his claims and entered Judgment in favor of
8  Defendants.  On November 14, 2013, the Ninth Circuit issued a Mandate reversing the entry
9  of Judgment and, among other things, directed the Court "to address alternate theories of
10 standing, including whether Pogrebnoy acquired an ownership interest in the Kurier mark on
11 the basis of an assignment from his wholly-owned company, which had priority of use of the
12 mark over defendants, or whether Pogrebnoy was a nonowner with a cognizable commercial
13 interest in the Kurier mark."  Pogrebnoy v. Russian Newspaper Distrib., Inc., 536 F. App'x.
14 737, 738 (9th Cir. Aug. 5, 2013) (citing Halicki Films, LLC v. Sanderson Sales & Mktg.,
15 547 F.3d 1213, 1225-26 (9th Cir. 2008)).
16       The Court, sitting without a jury, conducted a bench trial on February 25, 2014,
17 September 2, 2014, and September 3, 2014.  The parties submitted trial declarations, the
18 Court took evidence, and allowed for cross-examination of the parties' witnesses.
19 Following the trial, the parties submitted proposed Findings of Fact and Conclusions of Law
20 pursuant to Federal Rule of Civil Procedure 52(a).[1/]  Defendants also filed a Motion for
21 Judgment on Partial Findings Pursuant to Federal Rule of Civil Procedure 52(c) (Docket No.
22 179).
23       The Court issued Findings of Fact and Conclusions of Law and a Judgment on
24 December 18, 2014.  One of several alternative bases for the Court's conclusion that

---

[1/]    The Court ordered the parties to review the other side's proposed Findings of Fact and Conclusions of Law and to mark them to indicate the particular factual assertions and legal conclusions they disputed.  The facts that are in dispute on which the Court relies in reaching its conclusion are supported by the record.

-2-

Pogrebnoy had failed to satisfy his burden of proof on his claims was that Pogrebnoy had failed to establish by a preponderance of the evidence that he was the first to use the Курьер mark in the relevant Los Angeles-area market. This holding was premised on the Tea Rose-Rectanus doctrine involving the priority of use of a mark in a geographic area. See Grupo Gigante SA De CV v. Dallo & Co., 391 F.3d 1088 (9th Cir. 2004).

Pogrebnoy appealed the Court's Judgment. In a Memorandum Disposition issued on July 13, 2017, the Ninth Circuit affirmed in part, reversed in part, and remanded the action to this Court because, after this Court issued its Findings of Fact and Conclusions of Law, the Ninth Circuit had concluded that the Tea Rose-Rectanus doctrine does not apply where the junior user had knowledge of the senior user's prior use. See Stone Creek, Inc. v. Omnia Italian Design, Inc., __ F.3d __, 2017 WL 3724419, No. 15-17418 (9th Cir. July 11, 2017). Specifically, the Ninth Circuit reversed and remanded the action with directions that this Court:

> [G]ive further consideration to Pogrebnoy's trademark infringement claim. On remand, the district court should also reconsider whether Pogrebnoy expressly or implicitly granted Matusov a license to use the Курьер mark and whether Pogrebnoy is entitled to damages or injunctive relief.

(9th Circuit's Memorandum at 2, Docket No. 209.) The Ninth Circuit affirmed this Court's classification of Курьер as a descriptive rather than suggestive mark. The Ninth Circuit also affirmed several of this Court's evidentiary and procedural decisions and this Court's conclusion that Pogrebnoy failed to prove a claim for trade dress infringement. After issuance of the Ninth Circuit's Mandate, this Court ordered the parties to file briefs with argument concerning the issues the Ninth Circuit instructed this Court to reconsider.

The Court has considered those briefs and again reviewed the evidence and testimony presented by the parties during the 2014 Court Trial. Having considered the materials submitted by the parties, observed the witnesses during cross-examination, and after reviewing the evidence, the Court makes the following Revised Findings of Fact and

Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a) on the issues the Ninth Circuit remanded to this Court to reconsider. Any finding of fact that constitutes a conclusion of law is hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is hereby adopted as a finding of fact.

I.      **FINDINGS OF FACT**

1.      Pogrebnoy's FAC alleges that his trademark, which is unregistered, "consists of the Russian word 'Курьер.'" (FAC ¶ 1.)

2.      "Курьер" is the Russian equivalent of the English word "courier."

3.      Pogrebnoy asserts that he has standing to pursue the claims alleged in the FAC as a result of an assignment from Radony, Inc., a company he controls, that he executed in November 2010.

4.      According to Pogrebnoy, Radony, Inc. acquired the intellectual property rights that were assigned to him in November 2010, through a series of assignments between companies either directly or beneficially owned and controlled by him.

5.      Pogrebnoy testified that he was the first owner of the intellectual property in 1992 until he transferred his rights to Russian Kurier, Inc., which owned the rights from November 1992 until 1996. Russian Kurier, Inc. transferred the rights in 1996 to Kurier Weekly, Inc. Kurier Weekly, Inc. was apparently owned by Svetlana Yavorsky, although Pogrebnoy claims that he was the "beneficial owner" and Yavorsky was merely the "nominal" owner. According to Pogrebnoy, in 2000, Kurier Weekly, Inc. transferred its rights to VPP, Inc., which owned the rights until 2005 or 2006, when the rights were assumed by RWNY, Inc. RWNY, Inc. then transferred the rights to Radony, Inc. in 2007. Radony, Inc. owned the rights until November 2010, when Pogrebnoy caused Radony, Inc. to transfer the rights to him so that he could pursue this action <u>pro se</u>. Other than the assignment from Radony, Inc. to Pogrebnoy, Pogrebnoy has not admitted into evidence any written document memorializing these transfers. Nor is there any evidence, other than Pogrebnoy's testimony, that these transfers explicitly or implicitly transferred any trademark or trade dress rights.

6. At trial, Pogrebnoy stated that these transfers between companies were undertaken for a variety of purposes, including to avoid judgments, bad publicity from litigation unrelated to the present dispute, and unpaid taxes. No consideration was ever provided for these assignments.

7. The Court, having observed Pogrebnoy during his testimony, finds that Pogrebnoy is not a credible witness. He was evasive and combative while testifying. He also asserted his Fifth Amendment rights against self-incrimination when he initially declined to answer several questions. See Nationwide Life Ins. Co. v. Richards, 541 F.3d 903, 911 (9th Cir. 2008) ("When a party asserts the privilege against self-incrimination in a civil case, the district court has discretion to draw an adverse inference from such assertion."). The Court also finds that Pogrebnoy frequently failed to observe corporate formalities, and has not always conducted his business dealings in an entirely ethical manner.

8. The Court also concludes, based on its observations of Matusov's testimony, that although Matusov is more credible than Pogrebnoy, Matusov is not an entirely credible witness and that he too has not always conducted his business dealings in an entirely ethical manner.

9. According to Pogrebnoy, he began publishing and distributing a Russian language newspaper titled "Курьер" in New York in 1992.

10. Pogrebnoy and Matusov agree that their business relationship started in 1994 with Pogrebnoy sending to Matusov copies of the New York version of the Курьер newspaper. According to Matusov, he distributed the Курьер newspaper in Los Angeles for a period of approximately 12 weeks to test the desirability of launching a Los Angeles version of Курьер. Pogrebnoy did not charge Matusov for these copies, and there is no evidence that Pogrebnoy sold advertisements directed at the Los Angeles market during this test period or in any other way received any funds as a result of this test of the Los Angeles market.

11. Pogrebnoy and Matusov agree that they entered into an oral contract in 1994. Although Pogrebnoy and Matusov dispute the terms of that contract, there is no evidence that when they entered into their agreement, the parties discussed a license for any intellectual property rights.

12. According to Pogrebnoy, he and his New York companies would provide the film negatives, and after the technology changed, computer files, of the New York Курьер to Matusov for creation of the Los Angeles Курьер. In exchange, Matusov was to pay Pogrebnoy and his companies 50% of his profits. Pogrebnoy testified that this arrangement was modified in about 1996 with Matusov retaining 60% of the profits and Pogrebnoy receiving 40% of the profits of the Los Angeles Курьер.

13. According to Matusov, he promised to pay Pogrebnoy a flat fee of $2,800.00 each month for the negatives, and later computer files, of the New York Курьер from which he would then create the Los Angeles Курьер. Matusov states that he would replace most of the advertisements appearing in the New York Курьер with advertisements he sold for the Los Angeles Курьер and use some but not all of the articles that had appeared in the New York Курьер. Matusov would not replace advertisements that Pogrebnoy and his companies had sold to run in both the New York and Los Angeles versions of Курьер. These advertisements would run in the Los Angeles version of Курьер at no charge to Pogrebnoy.

14. Matusov would then arrange for the publication and distribution of the Los Angeles version of Курьер. Defendant Ginzberg became involved in the production of the Los Angeles version of Курьер in 1995.

15. In 1996, Pogrebnoy added "'Kurier' Russian Weekly Newspaper" to the masthead of the New York Курьер. This description, which Pogrebnoy calls an "anglicized" translation of the word "courier" with a Cyrillic "K," was also used in the Los Angeles version of Курьер. Although the FAC does not clearly articulate the claim,

Pogrebnoy asserts that he owns the rights to the unregistered trademarks of both "Курьер" and "Kurier."[2]

16. Whatever the arrangement between Pogrebnoy and Matusov was, it continued until 2007, when Pogrebnoy accused Matusov of not paying to Pogrebnoy all sums Pogrebnoy thought were owed to him.

17. According to Matusov, Pogrebnoy complained in 2007 that his New York Курьер was having financial problems. Matusov states that Pogrebnoy told him that "he would leave me in peace if I immediately turned over to him my business, including all my phone numbers, all my accounts, the keys to my post office box, and all checks" made payable to Matusov's company. According to Matusov, Pogrebnoy said that if Matusov did not agree to these terms and surrender his business to Pogrebnoy, Pogrebnoy would "go to 'war' with me." When Pogrebnoy made these statements, he had already moved from New York to the Los Angeles area.

18. Pogrebnoy states that as a result of this dispute, he terminated Matusov's license to use his trademarks and trade dress on November 26, 2007.

19. Pogrebnoy instituted a trademark, trade dress, and breach of contract action against Defendants in February 2008 in Case No. CV 08-1080 PA (SSx) (the "2008 Action"). In support of his Motion for Partial Summary Judgment in the 2008 Action, Pogrebnoy stated that, contrary to the allegations in the operative Complaint filed in that action, which had alleged that Pogrebnoy was the owner of the trademarks, those marks were owned by Radony, Inc. The Court therefore concluded that Pogrebnoy was not the

---

[2] In his papers throughout this litigation, Pogrebnoy has referred to both marks collectively as the "Kurier" mark. Without appreciating the potential distinctions between "Курьер" and "Kurier," this Court similarly used "Kurier" when discussing the trademarks at issue in some of its prior orders. The Ninth Circuit's first Opinion on appeal, issued on August 5, 2013, similarly used "Kurier" and "Курьер" interchangeably. As will be discussed in further detail below, the Court concludes that the alleged marks should be evaluated separately. The Court will therefore distinguish between the two alleged marks in these Findings of Fact and Conclusions of Law.

owner of the intellectual property at issue and that Defendants' were entitled to summary judgment.

20. Ginzburg and Russian Newspaper Distribution, Inc. ("RND"), obtained a federal registration for the trademark "LAKurier.com" in August 2010.

21. Pogrebnoy caused Radony, Inc. to assign its intellectual property rights to him and he commenced this action in November 2010. The New York Курьер ceased publication in 2011.

22. After reconsidering the evidence, the Court concludes that there is no evidence of an express license between Pogrebnoy and Defendants concerning the trademarks at issue in this litigation. Specifically, Pogrebnoy's description of the oral contract between him and Matusov did not include any terms concerning a trademark and trade dress license. There simply is no evidence, let alone a preponderance of evidence, tending to indicate that Pogrebnoy and Matusov discussed any issues concerning trademark and trade dress rights or licenses when they negotiated their oral contract in 1994. Instead, as Matusov testified, it is more likely that the parties agreed that Pogrebnoy would provide the negatives from which Matusov would create the Los Angeles version of Курьер, utilizing the articles and page layouts supplied by Pogrebnoy, in exchange for payment from Matusov. There is no evidence that, in 1994, when Pogrebnoy entered into the oral contract with Matusov that either party knew or cared about trademark and trade dress rights. Nor is there any evidence that the parties ever conducted negotiations concerning a license for the Kurier mark when that mark was added to the newspapers in 1996.

23. This conclusion is further supported by the fact that after Pogrebnoy and Matusov entered into their oral contract, Pogrebnoy has been involved in several intellectual property disputes involving both copyright law, see Itar-Tass Russian News Agency v. Russian Kurier, Inc., 886 F. Supp. 1120 (S.D.N.Y. 1995), and trademark licensing, see Russian Kurier, Inc. v. Russian American Kurier, Inc., 899 F. Supp. 1204 (S.D.N.Y. 1995). The Court concludes that it is more likely than not that Pogrebnoy learned about the value of intellectual property rights and trademark licenses from those experiences. As a result, his

"termination" of the purported license, some 13 years after entering the oral contract, is not sufficient evidence from which the Court can find the existence of an express license. Instead, Pogrebnoy appears to be attempting to use the ambiguity in the original oral contract to take Defendants' business from them.

24. The Court finds that Pogrebnoy granted to Defendants an implied license to use the trademarks at issue in this litigation. The course of conduct between the parties, including Pogrebnoy's sending of films and files, which included the trademarks, and Defendants' incorporation of those materials into the versions of the newspapers they published, is sufficient evidence to establish the existence of an implied license allowing Defendants to use the trademarks at issue.

25. The course of conduct between the parties also included the shipment from Defendants to Pogrebnoy's New York businesses of copies of the Los Angeles version of the newspaper. Pogrebnoy's businesses used these copies as evidence of the publication of advertisements in the Los Angeles editions of the newspapers to obtain payment from the advertisers who had purchased advertising space in both newspapers from Pogrebnoy's businesses. Although there is some evidence that Pogrebnoy's businesses may have also reviewed the Los Angeles editions for "quality control" purposes, Defendants dispute that Pogrebnoy and his businesses ever exercised control over the Los Angeles editions of the newspaper. While there is no evidence that Pogrebnoy could have, or ever did, exert control over the Los Angeles newspaper prior to the publication of any particular edition, it was possible for Pogrebnoy and his businesses to monitor the quality of the Los Angeles newspaper from one edition to the next.

26. Pogrebnoy's evidence in support of his claim for damages of $1,707,450.23 is contained in his Additional Trial Declaration of Oleg Pogrebnoy ("Add'l Pogrebnoy Decl.") (Docket No. 146). Pogrebnoy has calculated this amount based on his own "calculations of the Defendants' bank statements" to derive Defendants' gross income and subtracting from that amount his estimates of their printing and distribution costs. (Add'l Pogrebnoy Decl. ¶¶ 76-81.)

27. Pogrebnoy has not satisfied his evidentiary burden to establish that he has suffered any actual damages. There is insufficient evidence to establish that the New York version of Курьер and Pogrebnoy lost any sales or suffered damages as a result of the publication of the Los Angeles version of Курьер. Nor has Pogrebnoy introduced sufficient evidence of Defendants' sales to support an award of Defendants' profits even if an award of such damages were otherwise appropriate. Here, an award of any damages, including Defendants' profits, would not be equitable. There is no evidence that any consumers purchased the Los Angeles Курьер thinking it was the New York Курьер, nor is there any evidence that advertisers were deceived into purchasing advertisements in the Los Angeles Курьер thinking they were advertising in the New York Курьер.

28. Nor has Pogrebnoy satisfied his evidentiary burden to establish the value of the trademarks at issue in this litigation. As the Court has noted, the Ninth Circuit has affirmed this Court's conclusion that Курьер is no more than a distinctive mark. The Court similarly concludes that Kurier, as a Cyrillic-inspired spelling of "courier" is also no more than a distinctive mark. The parties did not negotiate a fee for use of the trademarks separate from the transfer of the films and files of the New York version of the paper, and therefore did not place a specific value on the trademarks. Nor is there any evidence that whatever success and profits Defendants have achieved are the result of the value and use of the trademarks rather than Defendants' efforts over more than a decade to develop a readership and advertising base in Los Angeles.

## II.  CONCLUSIONS OF LAW

1. "To establish standing to sue for trademark infringement under the Lanham Act, a plaintiff must show that he or she is either (1) the owner of a federal mark registration, (2) the owner of an unregistered mark, or (3) a nonowner with a cognizable interest in the allegedly infringed trademark." Halicki Films, LLC v. Sanderson Sales & Mktg., 547 F.3d 1213, 1225 (9th Cir. 2008); see also id. at 1226 (quoting Nat'l Licensing Ass'n, LLC v. Inland Joseph Fruit Co., 361 F. Supp. 2d 1244, 1256 (E.D. Wash. 2004)

("[T]o maintain a [claim under § 1125(a)], the plaintiff must show that it has a commercial interest in the allegedly misused mark that is likely to be damaged.") (citation omitted)).

2.     The Court concludes that Pogrebnoy has established by a preponderance of the evidence that he is either an owner of the purported unregistered marks at issue in this litigation or a nonowner with a cognizable interest in the allegedly infringed intellectual property to establish his standing to pursue his claims that Defendants have infringed his intellectual property rights.

3.     Marks are generally classified in one of five categories of increasing distinctiveness:  (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful. Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768, 112 S. Ct. 2753, 120 L. Ed. 2d 615 (1992).  Which category a mark belongs in is a question of fact.  See Lahoti v. VeriCheck, Inc., 586 F.3d 1190, 1195–96 (9th Cir.2009).  Suggestive, arbitrary, and fanciful marks are considered "inherently distinctive" and are automatically entitled to federal trademark protection because "their intrinsic nature serves to identify a particular source of a product." Two Pesos, 505 U.S. at 768, 112 S. Ct. 2753.  Generic marks are not eligible for trademark protection. Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1141 (9th Cir. 2002).  Merely descriptive marks are somewhere in-between; although they are not inherently distinctive and are therefore not entitled to automatic trademark protection, a merely descriptive mark can become protectable if it has acquired distinctiveness "as used on or in connection with the applicant's goods in commerce."  Zobmonda Entm't, LLC v. Falls Media, LLC, 602 F.3d 1108, 1113 (9th Cir. 2010) (quoting 15 U.S.C. § 1052(f)).  This acquired distinctiveness is referred to as "secondary meaning."  Two Pesos, 505 U.S. at 769, 112 S. Ct. 2753.

4.     The Court concludes that Курьер and Kurier are distinctive marks.  See Gazette Newspapers, Inc. v. New Paper, Inc., 934 F. Supp. 688, 693 (D. Md. 1996) ("The policies underlying the classifications . . . indicate that 'Gazette' should be considered descriptive.").

5.     In asserting that he "terminated" Matusov's "license to use the Kurier newspaper, trademark and trade dress" on November 26, 2007, Pogrebnoy claims that he had licensed to Matusov the Курьер and Kurier trademarks. Having already concluded that an implied license allowing Defendants to use the marks existed, Defendants' use of those marks after a valid termination would be infringing. See Wetzel's Pretzels, LLC v. Johnson, 797 F. Supp. 2d 1020, 1025 (C.D. Cal. 2011); McCarthy on Trademarks § 25:31 ("Once a . . . license contract is terminated, there is no doubt that the former . . . licensee has no authorization or consent to continue use of the mark. After the permission to use the mark has ended, use of the mark must cease.").

6.     Here, there is no evidence that the implied license was irrevocable or for a period of time that has not expired. Instead, an implied license, like any other contract, is terminable at the will of either party if it is not for a specified term. See Rano v. Sipa Press, Inc., 987 F.2d 580, 585 (9th Cir. 1993) ("Under California contract law, agreements of non-specified duration are terminable at the will of either party."). The Court therefore concludes that Pogrebnoy could and did validly terminate the implied license in November 2007.

7.     The receipt by Pogrebnoy's businesses of copies of Defendants' newspaper is sufficient under the circumstances to conclude that Pogrebnoy has not abandoned his marks under a "naked licensing" theory. See Barcamerica Int'l USA Trust v. Tyfield Importers, Inc., 289 F.3d 589, 596-97 (9th Cir. 2002); see also id. at 598 ("[W]e recognize that 'the standard of quality control and the degree of necessary inspection and policing by the licensor will vary with the wide range of licensing situations in use in the modern marketplace.'" (quoting McCarthy § 18:55)).

8.     Courts in the Ninth Circuit typically apply the eight factors set out in AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir. 1979), to determine whether a defendant's use of a mark or name creates a likelihood of confusion. Those factors are: (1) the strength of the mark; (2) the proximity of the goods; (3) the similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care

likely to be exercised by the purchaser; (7) defendant's intent in selecting its mark; and (8) likelihood of expansion into other markets. Sleekcraft, 599 F.2d at 348-49. "[I]dentical marks paired with identical goods can be case-dispositive." Stone Creek, __ F.3d at __, 2017 WL 3724419, at *4 (quoting Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp., 174 F.3d 1036, 1056 (9th Cir. 1999)). Here, in assessing the Sleekcraft factors, the Court concludes that Pogrebnoy has satisfied his burden to establish a likelihood of confusion between the identical marks that are used for identical goods.

9. Because Pogrebnoy has established a trademark claim for his unregistered marks, he also prevails on his claim for unfair competition. See Cleary v. News Corp., 30 F.3d 1255, 1263 (9th Cir. 1994) ("This Circuit has consistently held that state common law claims of unfair competition . . . are 'substantially congruent' to claims made under the Lanham Act."); E & J Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1288 n.2 (9th Cir. 1992) ("[T]he elements of infringement and unfair competition claims are essentially the same; the rulings stand or fall together.").

10. The Court lacks jurisdiction to consider Pogrebnoy's claim for cancellation of Defendants' registration of their LAKurier.com mark. Specifically, 15 U.S.C. § 1119 provides: "In any action involving a registered mark the court may determine the right to registration, order the cancelation [sic] of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action." According to the Ninth Circuit: "This language specifies that cancellation may only be sought if there is already an ongoing action that involves a registered mark; it does not indicate that a cancellation claim is available as an independent cause of action." Airs Aromatics, LLC v. Opinion Victoria's Secret Stores Brand Mgmt., 744 F.3d 595, 599 (9th Cir. 2014). Because Pogrebnoy's Курьер and Kurier marks are not registered, this action does not otherwise involve a registered mark. The Court therefore lacks jurisdiction over his cancellation claim. "This interpretation also helps preserve the use of actions before the USPTO Trademark Board as the primary vehicle for cancellation." Id. Pogrebnoy's citations to 15 U.S.C. § 1052(d) and 15 U.S.C. § 1064 do not alter this analysis.

-13-

1 | Instead, those provisions only apply to cancellation proceedings before the Patent and Trademark Office. See Windsurfing Int'l Inc. v. AMF Inc., 828 F.2d 755, 758 (Fed. Cir. 1987) (holding that 15 U.S.C. § 1064(c) does not authorize suits for cancellation in district courts)' McCarthy on Trademarks § 30:110 ("Lanham Act § 14, 15 U.S.C. § 1064, relates only to administrative Trademark Board proceedings in the Patent and Trademark Office. It does not authorize suits for cancellation in a federal District Court.").

11. Pogrebnoy has failed to establish by a preponderance of the evidence either the fact of damages or the amount of damages. See Skydive Arizona, Inc. v. Quattrocchi, 673 F.3d 1105, 1112 (9th Cir. 2012) ("The trier of fact must distinguish between the proof of the fact of damages and the amount of damages because a mark holder is held to a lower standard in proving the exact amount of actual damages.") (citing La Quinta Corp. v. Heartland Properties, LLC, 603 F.3d 327, 342 (6th Cir. 2010)).

12. "Under the Lanham Act, the court, 'in its discretion,' may award '(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action' for a 'violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 43(a) or (d) . . . , or a willful violation under section 43(c).'" Skydive Arizona, 673 F.3d at 1111-12 (quoting 15 U.S.C. § 1117(a)); see also Lindy Pen Co. v. Bic Pen Corp., 982 F.2d 1400, 1407 (9th Cir. 1993) (holding that Lanham Act damages for infringement are "subject to equitable principles."). The Lanham Act provides:

> When a violation of any right of the registrant of a mark
> registered in the Patent and Trademark Office, a violation under
> section 1125(a) or (d) of this title, or a willful violation under
> section 1125(c) of this title, shall have been established in any
> civil action arising under this chapter, the plaintiff shall be
> entitled, subject to the provisions of sections 1111 and 1114 of
> this title, and subject to the principles of equity, to recover (1)
> defendant's profits, (2) any damages sustained by the plaintiff,

-14-

and (3) the costs of the action. The court shall assess such
profits and damages or cause the same to be assessed under its
direction. In assessing profits the plaintiff shall be required to
prove defendant's sales only; defendant must prove all elements
of cost or deduction claimed. In assessing damages the court
may enter judgment, according to the circumstances of the case,
for any sum above the amount found as actual damages, not
exceeding three times such amount. If the court shall find that
the amount of the recovery based on profits is either inadequate
or excessive the court may in its discretion enter judgment for
such sum as the court shall find to be just, according to the
circumstances of the case. Such sum in either of the above
circumstances shall constitute compensation and not a penalty.
The court in exceptional cases may award reasonable attorney
fees to the prevailing party.

15 U.S.C. § 1117(a).

13. Pogrebnoy has not satisfied his evidentiary burden to establish that he has suffered any actual damages. There is insufficient evidence to establish that the New York version of Курьер and Pogrebnoy lost any sales or suffered damages as a result of the publication of the Los Angeles version of Курьер. Nor has Pogrebnoy introduced sufficient evidence of Defendants' sales to support an award of Defendants' profits even if such an award of such damages were appropriate. The Court additionally concludes that an award of damages that included Defendants' profits would not be equitable. There is no evidence that any consumers purchased the Los Angeles Курьер thinking it was the New York Курьер, nor is there any evidence that advertisers were deceived into purchasing advertisements in the Los Angeles Курьер thinking they were advertising in the New York Курьер. Nor is there any evidence concerning the value of the trademarks or the degree to which those

trademarks, as opposed to Defendants' efforts, contributed to the success of Defendants' publication.

14. Moreover, Pogrebnoy has not met his burden to establish that Defendants' infringement was willful. "Willful infringement carries a connotation of deliberate intent to deceive. Courts generally apply forceful labels such as 'deliberate,' 'false,' 'misleading,' or 'fraudulent' to conduct that meets this standard." Lindy Pen Co., 982 F.2d at 1406. Here, for instance, even though the Court has now concluded that Pogrebnoy conveyed to Matusov an implied license to use the Курьер and Kurier marks that Pogrebnoy could terminate at will, Matusov and Defendants had a genuine basis for disputing those facts such that their continued use of the marks should not be considered willful.

15. For all of these reasons, the Court, in its discretion, concludes that there is insufficient evidence, and in applying principles of equity, it will not award to Pogrebnoy, either actual damages or Defendants' profits. As a result of these evidentiary and equitable reasons to deny Pogrebnoy either actual damages or Defendants' profits, the Court elects instead to award nominal damages of $1.00 for each year since the termination of the implied license in November 2007. The Court therefore awards $10.00 in nominal damages to Pogrebnoy.

16. The Ninth Circuit also ordered this Court to reconsider if Pogrebnoy is entitled to injunctive relief. According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief:

> A plaintiff must demonstrate: (1) that it has suffered an
> irreparable injury; (2) that remedies available at law, such as
> monetary damages, are inadequate to compensate for that injury;
> (3) that, considering the balance of hardships between the
> plaintiff and defendant, a remedy in equity is warranted; and (4)
> that the public interest would not be disserved by a permanent
> injunction.

eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391, 126 S. Ct. 1837, 1839 (2006). Here, in evaluating the four factors, the Court concludes that Pogrebnoy is entitled to a permanent injunction preventing Defendants from using the Курьер and Kurier marks to identify their publication. The Court will, however, allow Defendants a short period of time to transition to a new name while it informs its readers and advertisers of the change. The Court will therefore allow Defendants to continue to use the marks through January 31, 2018, and permanently enjoin Defendants' use of the marks beginning on February 1, 2018.

17. Pogrebnoy has failed to establish any claim against defendant MMAP, Inc., which is a defunct corporation.

18. The Court concludes that this is not an "exceptional case" and therefore declines to award attorneys' fees to the prevailing parties. According to the Ninth Circuit, "exceptional cases" can include those where "the non-prevailing party's case is 'groundless, unreasonable, vexatious, or pursued in bad faith.'" Gracie v. Gracie, 217 F.3d 1060, 1071 (9th Cir. 2000) (quoting Interstellar Starship Servs., Ltd. v. Epix, Inc., 184 F.3d 1107, 1112 (9th Cir. 1999)); see also Interstellar Starship Servs., 184 F.3d at 1112 (explaining that "exceptional cases" may include those in which the losing party engaged in "malicious, bad faith, fraudulent, deliberate or willful conduct"). The Court has concluded that Defendants are entitled to Judgment on Pogrebnoy's claim for trade dress infringement and that it lacks jurisdiction over his claim for cancellation of the federally-registered mark. The Court has additionally concluded that Pogrebnoy, who proceeded without an attorney, is entitled to Judgment on his trademark infringement and unfair competition claims. None of the non-prevailing parties' claims or defenses were groundless, unreasonable, or pursued vexatiously or in bad faith.

. . . .

. . . .

. . . .

. . . .

. . . .

## CONCLUSION

For all of the foregoing reasons, the Court will enter a Judgment and Permanent Injunction consistent with these Findings of Fact and Conclusions of Law.

IT IS SO ORDERED.

DATED: October 2, 2017

                                                    Percy Anderson
                                     UNITED STATES DISTRICT JUDGE